685 S.E.2d 903

**STATE of West Virginia, ex rel. Gregory BURDETTE, Petitioner,**

v.

**The Honorable Paul ZAKAIB, Jr. Kanawha County Circuit Court Judge, Respondent.**

**No. 34857.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 23, 2009.

Decided Nov. 2, 2009.

Baron Michael Helgoe, Esq., Victor, Victor & Helgoe, Charleston, WV, for Petitioner.

Jennifer L. Dowdy Meadows, Esq., Assistant Prosecuting Attorney, Charleston, WV, for Respondent.

WORKMAN, Justice:

The petitioner, Gregory Burdette, seeks an original jurisdiction writ of mandamus directing the respondent, the Honorable Paul Zakaib, Jr., Kanawha County Circuit Court Judge, to grant his motion for post-conviction DNA Testing that he filed as a part of an underlying habeas corpus action, *SER Burdette v. Haynes, Warden,* Civil Action No. 07–MISC–139. The evidence the petitioner wants tested is a cigarette butt that was submitted into evidence at his April 11, 1986, trial wherein a Kanawha County jury found him guilty of six counts of forgery, six counts of uttering, one count of kidnaping, and one count of first-degree murder for felony murder based upon the underlying crime of robbery. On February 27, 2009, the circuit court denied the petitioner's motion for post-conviction DNA testing. Thereafter, pursuant to W. Va.Code § 15–2B–14(j) (2004), the petitioner filed the present writ of mandamus

with this Court.[1] After reviewing the facts of the case, the issues presented, and the relevant statutory and case law, this Court finds that mandamus does not lie and therefore the petitioner's request for a writ of mandamus is denied.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Vincent Tyree (hereinafter, the "victim") was a teacher and coach at Sissonville Junior High School. On November 17, 1983, he left the school around 3:00 p.m. and disappeared. On November 18, 1983, a hunter found the victim's body on a hill near a gas pipeline at Second Creek in Kanawha County, West Virginia. According to evidence presented at the petitioner's trial, the victim had been shot twice in the back of the head and his body had been dragged down a hill. The victim was shot once in the back of the head as he walked up the hill and was shot a second time while lying face down on the ground. The police recovered one .38 caliber bullet from the ground and a second one from the victim's head. They further found the victim's checkbook stuffed in a pocket of his jacket. The checkbook had a bloody fingerprint on it, later identified as that of the petitioner's left middle finger. A cigarette lighter with drywall compound on it was also found near the victim's body along with a cigarette butt with teeth marks on the filter.

Prior to his disappearance, the victim was in the process of building a three-unit apartment building in Sissonville, West Virginia. He paid for labor and materials by check and often kept his checkbook in the glove compartment of his jeep. The victim hired the petitioner to do drywall work for him at the apartment building. It was later determined that the material on the lighter that was found near the victim's body was consistent with the drywall compound used by the petitioner at the victim's apartment building.

During their initial investigation, the police spoke with the petitioner to inquire if the victim had been to the construction site on the day of his disappearance. The petitioner stated that he had not been there that day. At a later point, however, the police spoke with the petitioner again as they had ascertained that checks had been stolen from the victim and cashed by the petitioner. In fact, a handwriting expert, a fingerprint expert, and two clerks from the Big H Store connected the petitioner to some, if not all, of the forged checks.

At trial, State Police Serologist Lynn Inman testified regarding her tests of a cigarette butt found at the crime scene. This evidence is also the subject of the petitioner's current petition for a writ of mandamus in this Court. Ms. Inman explained that the cigarette butt contained the genetic marker ABO Type O. She further testified that she tested known cigarette butts from the petitioner that were retrieved from his car and house, and determined from saliva found on them that the petitioner was also ABO Type O. The petitioner did not dispute that this was his blood type. Notwithstanding such testimony, during cross-examination by the petitioner's attorney, Ms. Inman acknowledged that the cigarette butt in question may not have belonged to the petitioner, and that indeed it could have been used by almost half the people in this country, thus, reducing its believability as evidence against him. Some of her testimony is as follows:

Q. Oh, goodness, does that mean that the cigarette that was found at the scene is my client's cigarette?

A. No, sir I can only say that the blood types are consistent.

Q. Well, how many—what percentage of the population has O type blood?

---

1. W. Va.Code § 15–2B–14(j), provides:
 An order granting or denying a motion for DNA testing under this section is not to be appealable and is subject to review only through a petition for writ of mandamus or prohibition filed with the supreme court of appeals by the person seeking DNA testing or the prosecuting attorney. The petition shall be filed within twenty days of the court's order granting or denying the motion for DNA testing. The court shall expedite its review of a petition for writ of mandamus or prohibition filed under this subsection.

A. Forty-three percent would be type O, but eighty percent are· secretors, so thirty-four percent would secrete a type O, on that cigarette butt.

Q. Thirty-four percent, one-third of the people in this country have type O blood then?

A. Thirty-four percent are type O secretors.

Q. O secretors?

A. Yes, sir.

Q. And what percent are type O, forty-three percent?

A. Yes, sir.

Q. So, almost half the people in this country have type O blood?

A. Yes, sir.

Q. Now is the only genetic marker that your laboratory is capable of doing on a saliva examination is that just to determine whether a person's blood is type A, B, AB, ABO or O?

A. Yes, sir.

Q. That's all you can do?

A. Yes, sir.

Q. You can't check saliva any further than that?

A. No sir.

Q. [O]h, by the way, did you ever check Greg Burdette's blood?

A. No, sir.

Q. You don't know what his type is, do you?

A. From the known cigarette butts, yes, sir, he is an O.

Q. But you never checked his blood?

A. No, sir.

With regard to the victim's stolen checkbook, the petitioner admitted at trial that he deceptively filled out and uttered at least six checks that had been stolen from the victim. He further acknowledged that he had obtained approximately $2,300.00 of the victim's money as a result of stealing and cashing the victim's checks. He cashed them at the Big H Store using the alias "Dale Burdette." He also placed his sister's telephone number on the checks.

The petitioner also admitted that he used money from the forged checks to purchase a handgun and ammunition on November 10, 1983, just one week prior to the victim's murder. He purchased the .38 caliber pistol and bullets using a fraudulent driver's license with his photograph, but with his brother's identifying information. While the murder weapon was never found, the bullets recovered from the murder scene were the same caliber as the bullets the petitioner purchased on November 10, 1983. The petitioner, however, claimed that he had thrown the gun and the bullets into the river three days after the victim was murdered because he feared the police would find them and charge him with the victim's murder. He claimed that he threw the gun into the Kanawha River near Patrick Street, but later said he threw it into the river from a bridge on Poca River Road.

The petitioner also gave the police a series of inconsistent and conflicting statements regarding the stolen checks and the victim's murder. In fact, he testified at trial that none of the five statements he gave to the police were true, but that some were only partially true. For instance, the petitioner initially denied any involvement in the underlying crimes except to state that he signed the victim's name to the checks. Thereafter, upon providing handwriting samples to the State Police, the petitioner then acknowledged that in addition to signing the victim's name, that he had, in fact, filled out the checks in their ·entirety and cashed them. He argued, however, that the checks were actually stolen by a Kenneth "Butch" Mitchell, with whom he stated he split the stolen money.

The petitioner next claimed that Mr. Mitchell had killed the victim to cover up the crimes relating to the stolen checks and that he knew nothing about the killing until Mr. Mitchell took him to see the victim's body. He then asserted that his alleged partner in crime was actually a person named Billy Eads. The petitioner later changed that person's name to Billy Edens and then to Billy Helmick. In each of the above scenarios, the petitioner claimed that his alleged partner in

the forgery and uttering crimes had been caught by the victim in the school parking lot attempting to steal additional checks from the glove compartment of the victim's vehicle. He then stated that this alleged person pulled a gun and made the victim drive the three of them to the remote location at Second Creek where the victim was shot and killed.

The petitioner acknowledged in his statements that the victim's shoes did not have any fingerprints on them stating that they had been held by a coat. He further stated in one of the statements that he had wiped the victim's vehicle of any fingerprints. The petitioner also admitted that he had the victim's blood on his hands. Each of these statements were made before any of the forensic testing had been performed on the items in question and before the information surrounding the victim's death became public knowledge.

On April 11, 1986, a Kanawha County jury found the petitioner guilty of six counts of forgery, six counts of uttering, one count of kidnaping, and one count of first-degree murder for felony murder based upon the under-

lying crime of robbery. The jury recommended mercy on the first-degree murder, but did not recommend mercy on the kidnaping conviction. On June 2, 1986, the petitioner was sentenced to concurrent sentences—resulting in a life sentence with no possibility of parole.

On August 3, 1989, the petitioner filed a petition for appeal with this Court, but that petition was refused by order entered on November 7, 1989. In 1993, the petitioner filed a petition for writ of habeas corpus in the circuit court of Kanawha County.[2] On July 25, 2003, an evidentiary hearing was held, and on January 26, 2004, the circuit court denied the petitioner's habeas petition in a detailed sixteen-page opinion that addressed each of the claims on the merits. The petitioner then filed a petition for appeal with this Court, and on January 19, 2005, said petition was refused. On March 28, 2007, the petitioner filed a pro se habeas petition founded upon the alleged false reports by the West Virginia State Police Forensic Laboratory taken during the time that former State Police Serologist Fred Zain was working at the laboratory.[3] Thereafter, the

---

**2.** His petition alleged the following errors: (a) denial of due process and fair trial as a result of the introduction tainted serological evidence; (b) denial of due process because the first-degree murder conviction was based upon insufficient evidence to support the underlying felony of robbery as the predicate for the felony-murder conviction; (c) denial of due process due to an improper kidnaping instruction; (d) denial of due process based on an improper aggravated robbery instruction; (e) prosecutorial misconduct pertaining to comments about the petitioner's failure to call a specific alibi witness; (f) prosecutorial misconduct for commenting on the pre-trial silence of alibi witnesses; (g) prosecutorial misconduct for attempting to improperly influence the jury; and (h) prosecutorial misconduct for appealing to the passion or prejudice of the jury.

**3.** As we explained in *State ex rel. McLaurin v. McBride,* 220 W.Va. 141, 145, 640 S.E.2d 204, 208 (2006):

In *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory,* 190 W.Va. 321, 438 S.E.2d 501 (1993) ["Zain I"], this Court noted that former State Police Officer Fred Zain had engaged in the systemic falsification of evidence relating to serology in criminal prosecutions. As a result, this Court held, *inter alia,* (1) that a prisoner would be

entitled to habeas relief, if, absent the forensic evidence presented by Trooper Zain, the evidence was insufficient "to support the verdict" and (2) that a prisoner seeking such relief could be subject to DNA testing.

This Court further explained that a "special judge found that Zain intentionally and systematically gave inaccurate, invalid, or false testimony or reports. The special judge concluded that Zain's misconduct was so egregious that it should be considered newly discovered evidence in any criminal prosecutions in which Zain offered evidence." *In the Matter of: Renewed Investigation of the State Police Crime Laboratory, Serology Division* ["Zain III"], 219 W.Va. 408, 410, 633 S.E.2d 762, 764 (2006).

Subsequent to the misconduct of Trooper Zain, this Court was confronted with the question of whether serologists employed by the State Police Crime Lab, other than Trooper Zain, had also falsified evidence in criminal prosecutions. This Court ordered another investigation in 1994, and upon a finding of some occasional but relatively minor errors which did not significantly compromise the criminal prosecutions in which the evidence was offered, the matter was closed. *See In the Matter of the West Virginia State Police Crime Laboratory, Serology Division* ["Zain II"], 191 W.Va. 224, 445 S.E.2d 165 (1994). In 1999, however, more allegations arose involving another serologist other than Trooper Zain resulting in

petitioner was appointed counsel who filed a motion for post-conviction DNA testing. A hearing on that motion was held on October 27, 2008, and the circuit court denied the motion on February 27, 2009. The petitioner then filed his present writ of mandamus with this Court as per the requirements of W. Va.Code § 15–2B–14(j).[4]

## II.

## STANDARD OF REVIEW

 As set forth above, the petitioner seeks a writ of mandamus directing the Kanawha County Circuit Court Judge to grant his motion for post-conviction DNA Testing. We have explained that " ' "[m]andamus lies to require the discharge by a public officer of a nondiscretionary duty." Point 3 Syllabus, *State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W.Va. 479 [, 153 S.E.2d 284 (1967) ].' Syllabus point 1, *State ex rel. West Virginia Housing Development Fund v. Copenhaver*, 153 W.Va. 636, 171 S.E.2d 545 (1969)." Syllabus Point 1, *State ex rel. Williams v. Department of Mil. Aff.*, 212 W.Va. 407, 573 S.E.2d 1 (2002). Our standard of review for proceedings in mandamus has long established that:

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). *Accord*, Syllabus Point 5, *Phillip Leon M. v. Greenbrier County Board of Education*, 199 W.Va. 400, 484 S.E.2d 909 (1996), modified in part, *Cathe A. v. Doddridge County Bd. of Educ.*, 200 W.Va. 521,

490 S.E.2d 340 (1997); Syllabus Point 2, *State ex rel. Blankenship v. Richardson*, 196 W.Va. 726, 474 S.E.2d 906 (1996); Syllabus Point 1, *Hickman v. Epstein*, 192 W.Va. 42, 450 S.E.2d 406 (1994); Syllabus Point 1, *State ex rel. McGraw v. West Virginia Ethics Com'n*, 200 W.Va. 723, 490 S.E.2d 812 (1997). Likewise, we have stated that a *de novo* standard of review applies to a circuit court's decision to grant or deny a writ of mandamus. *McComas v. Board of Educ. of Fayette County*, 197 W.Va. 188, 193, 475 S.E.2d 280, 285 (1996). Furthermore, "the burden of proof as to all the elements necessary to obtain mandamus is upon the party seeking the relief[,]" 52 Am. Jur. 2d Mandamus § 3 at 271 (2000) (footnote omitted), a failure to meet any one of them is fatal.

With these standards in mind, the assigned error will be considered.

## III.

## DISCUSSION

As noted above, the petitioner seeks a writ of mandamus under W. Va.Code § 15–2B–14 (2004), claiming that he has a right to post-conviction DNA testing of a cigarette butt that was used as evidence in his underlying trial. He also maintains that he has a right to such testing pursuant to this Court's decision in *In the Matter of Renewed Investigation of the State Police Crime Laboratory*, 219 W.Va. 408, 633 S.E.2d 762 (2006) (hereinafter, "*Zain III* ") because his conviction falls within the time period of 1979 and 1999, and since a serologist other than Fred Zain offered evidence against him.[5]

The petitioner declares that current DNA testing is more accurate than it was at the time of his trial and that such testing is necessary for him to establish that he was not the secretor of saliva on the cigarette

---

yet another investigation and this Court's decision in *In the Matter of: Renewed Investigation of the State Police Crime Laboratory, Serology Division* ["*Zain III* "], 219 W.Va. 408, 633 S.E.2d 762 (2006), which, in part, is the basis for the petitioner's argument herein.

4. *See* footnote 1, *supra.*

5. Syllabus Point 6 of *Zain III, supra,* provides that:

A prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evidence, and the challenge was finally adjudicated.

butt found at the crime scene. He argues that this will raise a reasonable probability that the verdict would have been more favorable to him and contends that a DNA test will provide solid evidence that he was not at the murder scene as it will establish that the cigarette butt was not his. Accordingly, the petitioner asserts that he is entitled to DNA testing of the cigarette butt under *Zain III*, as well as by the fact that he has satisfied the statutory elements for requesting DNA testing relief under W. Va.Code § 15–2B–14.

Conversely, the State maintains that the petitioner failed to fulfill the necessary requirements of both *Zain III* and W. Va.Code § 15–2B–14 and that this Court should deny his petition for a writ of mandamus. In particular, the State asserts that the evidence the petitioner wants to be tested would not likely produce an opposite result. The State further argues that in *Zain III*, this Court held that convictions based on false evidence will not be set aside unless it is shown that the false evidence had a material effect on the verdict. The State contends that the petitioner in the case at hand is unable to meet that burden.

In Syllabus Point 1 of *Zain III*, this Court reiterated that: " 'Although it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict.' Syllabus Point 2, *Matter of W.Va. State Police Crime Lab.*, 190 W.Va. 321, 438 S.E.2d 501 (1993) [*Zain I*]." In Syllabus Point 2 of *Zain III*, this Court explained that: " 'Serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Fred S. Zain, are not subject to the invalidation and other strictures contained in *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 190 W.Va. 321, 438 S.E.2d 501 (1993) [*Zain I*].' Syllabus Point 3, *Matter of W.Va. State Police Crime Lab.*, 191 W.Va. 224, 445 S.E.2d 165 (1994) [*Zain II*]." Moreover, in Syllabus Point 3 of *Zain III*, this Court relied on long-standing precedent that a petitioner must show the following:

" 'A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that [defendant] was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.' Syllabus Point 1, *Halstead v. Horton*, 38 W.Va. 727, 18 S.E. 953 (1894)." Syllabus, *State v. Frazier*, 162 W.Va. 935, 253 S.E.2d 534 (1979).

The clear import of *Zain III* is that the evidence sought to be tested must likely produce an opposite result if a new trial were to occur. A defendant simply cannot make unsupported and blanket allegations and expect a circuit court to grant him a new trial. A conclusion to the contrary defies any sense of judicial efficiency and economy and would lead to needless multiple trials. Therefore, we now hold that this Court's ruling in *In the Matter of Renewed Investigation of the State Police Crime Laboratory*, 219 W.Va. 408, 633 S.E.2d 762 (2006), does not afford every petitioner with alleged serology issues the right to additional DNA testing. In order to have the right to additional DNA testing, the evidence sought to be tested must likely produce an opposite result if a new trial were to occur, and the evidence cannot be such that its purpose is merely to impeach or discredit a State's witness.

In this case, the cigarette butt that the petitioner seeks to have tested was merely one piece of the evidence used at his trial. A thorough review of the record reveals that

even without the cigarette butt, the State still had overwhelming evidence to convict the petitioner. For instance, the State introduced evidence that a bloody fingerprint that matched the petitioner's fingerprint was found on the victim's checkbook; it provided the petitioner's admission that he forged the victim's name on several checks and cashed those checks; and outlined the petitioner's ever-changing and inconsistent statements regarding his alleged partner in crime who he claimed actually murdered the victim.

With regard to the petitioner's numerous statements provided to law enforcement officers, each painted the picture that the petitioner had intimate knowledge of what occurred at the time of the victim's murder. Furthermore, the fact that the petitioner could not produce his weapon or ammunition, purchased just one week prior to the victim's murder, and with money obtained by forging the victim's checks, amounted to even more damaging evidence against him. Likewise, the petitioner's claim that he had thrown the weapon and ammunition in the river three days after the victim's death, coupled with the conflicting statements on the location in which he supposedly disposed of them, was all evidence presented to the jury. Moreover, the State presented evidence at trial that the petitioner's weapon and ammunition were the same caliber as were used in the victim's murder.

It is clear to this Court that retesting the cigarette butt would be an exercise in futility as the petitioner's numerous statements put him at the crime scene. While the petitioner denied killing the victim, he stated he was at the crime scene because another person forced him to go there at gunpoint. As such, any subsequent DNA test proving that the cigarette butt was not the petitioner's would not have altered the result of his trial in any way as there was plenty of other evidence placing him at the crime scene. Furthermore, the jury heard the petitioner's counsel's effective cross-examination of Serologist Inman regarding the results of her testing of the cigarette butt wherein she acknowledged that thirty-four percent of the entire country had ABO Type O blood, yet it chose to convict him anyway. Thus, in consideration of all of the above, the evidence of the cigarette butt was not "such as ought to produce an opposite result at a second trial on the merits." Syllabus Point 3, *Zain III.* Accordingly, the petitioner is not entitled to a writ of mandamus on this issue as he has failed to satisfy the elements of Syllabus Point 2 of *Kucera, supra.*

■ This Court also recognizes that the petitioner's reliance on W. Va.Code § 15–2B–14 is misplaced. As is the case with *Zain III,* W. Va.Code § 15–2B–14 does not mandate testing in every criminal case and states that: "A person convicted of a felony currently serving a term of imprisonment may make a written motion before the trial court that entered the judgment of conviction for performance (DNA) testing." W. Va.Code § 15–2B–14(a). It further explains that "the right to file a motion for post-conviction DNA testing ... is absolute and may not be waived." W. Va.Code § 15–2B–14(m). Thus, in accordance with West Virginia Code § 15–2B–14 (2004), the West Virginia Legislature provides a defendant the absolute right to ask for DNA testing; however, it does not provide a defendant the absolute right to have DNA testing conducted. A petitioner seeking DNA testing must do more than make an unsupported allegation that he or she is entitled to such testing.

W. Va.Code § 15–2B–14(c)(1) also explains that "[t]he motion [by a petitioner seeking DNA testing] shall be verified by the convicted person under penalty of perjury and must do the following:

(A) Explain why the identity of the perpetrator was, or should have been, a significant issue in the case.

(B) Explain, in light of all the evidence, how the requested DNA testing would raise a reasonable probability the convicted person's verdict or sentence would be more favorable if the results of DNA testing had been available at the time of conviction.

(C) Make every reasonable attempt to identify both the evidence that should be tested and the specific type of DNA testing sought.

(D) Reveal the results of any DNA or other biological testing previously conduct-

ed by either the prosecution or defense, if known.

(E) State whether any motion for testing under this section has been filed previously and the results of that motion, if known.

Likewise, W. Va.Code § 15–2B–14(f) provides:

The court shall grant the motion for DNA testing if it determines all of the following have been established:

(1) The evidence to be tested is available and in a condition that would permit the DNA testing requested in the motion;

(2) The evidence to be tested has been subject to a chain of custody sufficient to establish it has not been substituted, tampered with, replaced or altered in any material aspect;

(3) The identity of the perpetrator of the crime was, or should have been, a significant issue in the case;

(4) The convicted person has made a prima facie showing that the evidence sought for testing is material to the issue of the convicted person's identity as the perpetrator of or accomplice to, the crime, special circumstance, or enhancement allegation resulting in the conviction or sentence;

(5) The requested DNA testing results would raise a reasonable probability that, in light of all the evidence, the convicted person's verdict or sentence would have been more favorable if DNA testing results had been available at the time of conviction. The court in its discretion may consider any evidence regardless of whether it was introduced at trial;

(6) The evidence sought for testing meets either of the following conditions:

(A) The evidence was not previously tested;

(B) The evidence was tested previously, but the requested DNA test would provide results that are reasonably more discriminating and probative of the identity of the perpetrator or accomplice or have a reasonable probability of contradicting prior test results;

(7) The testing requested employs a method generally accepted within the relevant scientific community;

(8) The evidence or the presently desired method of testing DNA were not available to the defendant at the time of trial or a court has found ineffective assistance of counsel at the trial court level;

(9) The motion is not made solely for the purpose of delay.

In his brief before this Court, the petitioner failed to comply with, or even address in his argument, many of the provisions of W. Va.Code § 15–2B–14(c)(1) or the nine mandatory requirements of W. Va.Code § 15–2B–14(f) that are required for his petition for a writ of mandamus to be granted. Instead, the petitioner makes unsupported blanket assertions that are not based in law or fact. After carefully reviewing all of the information before this Court, it is clear that the cigarette butt the petitioner seeks to have tested was not a material piece of evidence used in his conviction. And, as previously discussed, even if the cigarette butt evidence were removed from his trial in its entirety, there was overwhelming evidence introduced against him at trial that "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Moreover, the importance of the cigarette butt to the State's case against the petitioner was significantly diminished by the strong cross-examination by the petitioner's counsel which left jurors with the information that thirty-four percent of the population of this country had ABO Type O blood, and that anyone with that blood type could have left the cigarette butt at the crime scene. Furthermore, the cigarette butt was found in an open wooded area that was frequented by other people. In spite of this, the jury convicted the petitioner on all counts.

Equally important, the petitioner's own statements put him at the crime scene, which directly conflicts with the petitioner's argument that proving that the cigarette butt was not his would in some way exonerate him.

The following are the petitioner's answers during cross-examination at trial with regard to his various pre-trial statements placing him at the scene of the crime where the cigarette butt was found:

Q. Who said there was a blood spot up there on the ridge?

A. I did.

Q. Who said that the body was on its face?

A. I did.

Q. Who said it had been shot twice?

A. I did.

Q. Who said that he was shot once while walking up the hill?

A. I did.

Q. And who said that that shot was to the back of the head?

A. I did.

Q. Who said he was shot once while he was facedown on the ground?

A. I did.

Q. Who said the body was turned over?

A. I did.

Q. Who said he was dragged over the hill?

A. I did.

Q. Who said that they had a cigarette in their hand going up the hill?

A. I did.

Q. Who said the Jeep was parked up there close to where Mr. Tyree was shot?

A. I did.

Q. Who said he was pulled by his feet?

A. I did.

Q. Who said his shoes were jerked off?

A. I did.

Q. Who said you drove back down off the hill?

A. I did.

Q. Who said the wallet was taken?

A. I did.

Q. Who said the keys were taken?

A. I did.

Q. Who said a card was taken from Mr. Tyree's wallet?

A. I did.

Q. Who said that there was a checkbook handled on the scene?

A. I did.

Q. Who said that there was—had blood on their finger?

A. I did.

Q. Who said that the shoes were thrown out in the hollow?

A. I did.

Q. Who said the shoes were thrown to the left?

A. I did.

Q. Who said the Jeep was parked at the church?

A. I did.

Q. Who said it's their handwriting on their checks?

A. I did.

Q. Who said there was a gas line on the hill?

A. I guess I did. I don't remember.

Q. I will show you in a minute. Who said he pulled over the hill?

A. I did.

Q. Who said they'd bite their cigarettes?

A. I did.

Q. Who said there was a logging road up there?

A. I did.

Thus, the petitioner fails to demonstrate that "[t]he requested DNA testing results would raise a reasonable probability that, in light of all the evidence, [that his] verdict or sentence would have been more favorable if DNA testing results had been available at the time of conviction." W. Va.Code § 15–2B–14(f)(5). Likewise, the petitioner has failed to make "a prima facie showing that the evidence sought for testing is material to the issue of [his] identity as the perpetrator of or accomplice to, the crime, special circumstance, or enhancement allegation resulting in the conviction or sentence[.]" W. Va.Code § 15–2B–14(f)(4). In consideration of all of

the evidence introduced· at the petitioner's trial, it is clear that the cigarette butt was not material in his conviction. After thoroughly reviewing the record and considering all of the petitioner's arguments, we believe that the petitioner has failed to meet the required elements as outlined in Syllabus Point 2 of *Kucera, supra*, for issuance of a writ of mandamus. Accordingly, we deny his petition for a writ of mandamus.

## IV.

### CONCLUSION

For the foregoing reasons, the petitioner's petition for a writ of mandamus is denied.

Writ denied.