

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-79,318-02

### EX PARTE LEROY EDWARD COTY, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 1264113 IN THE 180TH DISTRICT COURT
### FROM HARRIS COUNTY

HERVEY, J., delivered the opinion of the unanimous Court. PRICE, J., filed a concurring opinion.

### O P I N I O N

In this Court's opinion on original submission, we granted Applicant relief based on a presumptive violation of his right to due process of law. *See Ex parte Coty*, No. WR-79,318-02 (Tex. Crim. App. June 5, 2013) (per curiam) (op. on orig. submission) (not designated for publication). On our own motion, we withdrew our opinion, granted rehearing, and ordered that this case be filed and set to answer "under what circumstances, if any, [this Court] should presume a due-process violation in a case handled by a forensic scientist who has been found to have committed misconduct in

another case." *Ex parte Coty*, No. WR-79,318-02 (Tex. Crim. App. June 26, 2013) (per curiam) (not designated for publication). We will remand to the habeas court for additional findings of fact and conclusions of law.

## I. BACKGROUND

### A. *Salvador*

The record reflects the following facts. Jonathan Salvador was a laboratory technician at the Houston Police Department's Crime Lab Division. On January 26, 2012, it was discovered that, during his six-year tenure, "Salvador committed 'professional misconduct' [by] using the evidence in one case to support the evidence in another case.'"[1] Additionally, the State filed a *Brady* disclosure, after the trial court signed its findings of fact and conclusions of law, indicating that Salvador was implicated in a second instance of "dry labbing" from April 2009.[2] Both matters were unrelated to Applicant's case.

---

[1]This is also colloquially referred to as "dry labbing." In this context, "dry labbing" occurs when results of a test are actually arrived at by guesswork or using evidence or results from another analysis. The Texas Forensic Science Commission concluded in its report that the substance Salvador was testing when he engaged in one instance of professional misconduct was, in fact, what he stated it was; however, he reached that result by using evidence from another case to support his falsified, but accurate, results.

[2]The record reflects that the habeas court signed its findings of fact and conclusions of law on May 3, 2013. However, the State filed a *Brady v. Maryland* Disclosure and another proceeding was held in this case on July 15, 2013. At that hearing, the State notified the court that it had issued a *Brady* disclosure to Applicant regarding another instance of "dry labbing." The disclosure filed by the State was admitted into the record as "Joint Exhibit No.1."

In that other case from April 2009, Salvador tested cocaine. According to the joint exhibit tendered by the State, a "reanalysis of the drug exhibit indicates that it [did] contain cocaine but with a difference in quantity and type of adulterants between the two exhibits."

The record also reflects that the Texas Forensic Science Commission ("TFSC") determined in a published report that Salvador had problems throughout his employment with the Texas Department of Public Safety ("DPS"), including "maintaining adequate case output" and "more than 1 in 3 of [his] case folders were returned for corrections[,]" usually administrative in nature.[3] DPS identified 4,944 cases that Salvador had worked on during his employment. The TFSC estimated that, of the cases Salvador worked on, 50%-75% of those cases have evidence remaining that can be retested. Moreover, the record shows that the Commission concluded that, although "Salvador fraudulently misrepresented data after attempting analysis on a pharmaceutical drug exhibit[,] . . . there was no evidence to suggest that there were property control issues of a systemic nature that might preclude future re-testing of evidence." Eleven days after Salvador's misconduct was discovered, DPS suspended Salvador, and Salvador resigned from his position five months after he was suspended.

In the wake of this situation, DPS notified the prosecuting attorneys and law-enforcement agencies, as well as others,[4] about the situation. In cases in which evidence still existed, DPS retested the evidence handled by Salvador "during the ninety day period

---

[3]This record includes three reports issued by agencies of the State of Texas. One report was published by the Texas Rangers, another by the Office of the Inspector General, and the last by the Texas Forensic Science Commission. The habeas court heavily relied on the report from the Texas Forensic Science Commission in its findings of fact and conclusions of law.

[4]Other entities notified included the Texas Forensic Science Commission and the American Society of Crime Laboratory Directors/Laboratory Accreditation Board.

surrounding the incident[,]" and as of the publication of TFSC's report, 440 additional cases were also reexamined. The habeas court agreed with the TFSC's report, and it concluded that "[t]o date this reanalysis has resulted in seven . . . corrective actions; this represents a correction rate of less than 2%."[5] We understand the court to mean that, even if the four corrective actions from the ninety-day period and the three corrective actions from the other 440 cases are combined and compared to the 440 cases, Salvador had "less than a 2%" error rate.[6] The record supports the court's findings of fact. Applications for writs of habeas corpus based on Salvador's actions followed.

Initially, this Court granted relief in a published opinion because "the lab technician who was solely responsible for testing the evidence in this case is the scientist found to have committed misconduct[,]" and the evidence in the case had been destroyed and could not be retested. *Ex parte Turner*, 394 S.W.3d 513, 514 (Tex. Crim. App. 2013) (per curiam). Later, we granted relief in unpublished opinions and extended our holdings to cases in which evidence remained to be tested. *See, e.g., Ex parte Smith*, No. AP–76,988, 2013 WL 831359, at *1 (Tex. Crim. App. Mar. 6, 2013) (per curiam) (not

---

[5]This quote is from the habeas court's finding of fact number nine.

[6]Without knowing how many cases existed in which evidence was retested during the ninety-day period, it is impossible to determine Salvador's error rate in those cases, although we know that he was issued four corrective actions in the unknown number of cases. If we compare the total seven corrective actions to the known, additional 440 cases, the error rate would be 1.5909%. This was presumably what the habeas court meant in its finding of fact. Salvador's error rate in the 440 cases, when compared to his three corrective actions in those cases, was .6818%.

designated for publication) (evidence remained to be retested but relief granted because "that evidence was in the custody of the lab technician in question"); *Ex parte Hinson*, No. AP–76,983, 2013 WL 831183, at *1 (Tex. Crim. App. Mar. 6, 2013) (per curiam) (not designated for publication) (evidence remains to be retested but it was in the sole custody of the lab technician and, as a result, is unreliable). We then issued our second published opinion dealing with this issue and granted the applicant relief, although there was sufficient evidence remaining to be retested. *See Ex parte Hobbs*, 393 S.W.3d 780 (Tex. Crim. App. 2013) (per curiam) ("This Court believes [that Salvador's] actions are not reliable; therefore custody was compromised, resulting in a due process violation."). The common factor in each "Salvador case" before this Court, whether unpublished or published, is that this Court found a presumptive due-process violation in each case in which he was the laboratory technician. The problem, of course, is that each case Salvador worked on is not the same.[7]

We granted rehearing on our own motion and filed and set this case for the parties to brief the Court regarding "under what circumstances, if any, [this Court] should presume a due-process violation in a case handled by a forensic scientist who has been

---

[7]For example, in some cases a portion of the recovered substance remains in the custody of the State, shows no indication of chain of custody issues, and can be retested, and in other cases, the recovered substance was destroyed during the original testing or was disposed of for some other reason. In some cases, the recovered substance was the only evidence of that criminal defendant's guilt, while in other cases there was *additional* evidence of guilt, whether in the form of different evidence (e.g., testimony or physical evidence) or evidence probative of guilt obtained from the recovered substance before Salvador came into custody of it (e.g., a presumptive field test, a positive alert by a K-9).

found to have committed misconduct in another case."

**B. Applicant's underlying case**

With respect to Applicant's underlying case, the habeas court made several relevant findings of fact. Sergeant Orlando Jacobs stopped Applicant for failing to signal a lane change and changing lanes in an unsafe manner. Based on Applicant's behavior after stopping him, Jacobs suspected that Applicant might have had narcotics in the car. Jacobs asked for consent to search Applicant's vehicle, and Applicant refused. A canine named Rico was called to the scene, and Rico alerted the officer to the odor of narcotics. Jacobs searched Applicant's vehicle and discovered a brown paper bag. Inside the bag was a "Golden Puffs" cereal box that contained one bag of cocaine. On the video, when Jacobs found the drug exhibit, he is heard stating that it looks like "half a kilo." A field test of the substance performed by Jacobs returned a positive result for cocaine, and he assessed its preliminary weight at 453 grams. Jacobs then submitted the evidence to the Baytown DPS station and "placed the brown paper bag, the 'Golden Puffs' cereal box, and the one . . . baggie containing the drug exhibit in a brown box, initialing where he has sealed the box." The drug exhibit was described as "Properly Sealed 8.5x10x14 brown box." When Jacobs appeared at the hearing at which the State argued that the habeas court should hold an evidentiary hearing, Jacobs "observed the sealed brown box that he checked into evidence . . . [,]" and he recognized "the box, 'Golden Puffs' cereal box, and the one (1) baggie of cocaine as the same evidence he found in Applicant's automobile

and tagged into evidence."

The habeas court also found that Salvador "exercised control over Applicant's drug exhibit for a little more than 24-hours." Salvador checked out the evidence on June 14, 2010 at 12:54 p.m. and returned it to the "to be filed" drawer on June 15, 2010 at 2:16 p.m. Moreover, Salvador's description of the evidence was consistent with Jacob's description, and Salvador noted that he tested only one exhibit, which is consistent with Jacobs finding only one bag. Salvador's description of the drug exhibit was also consistent with Jacobs's description at the time of arrest and the present-day contents of the exhibit, including that the outside container was an "8.5x10x14 Brown Box," and the "Inside Container" was a "Brown Paper Bag." Jacobs and Salvador also similarly described the contents of the brown paper bag as a "Golden Puffs Cereal Box." Brian Nacu, the laboratory technician charged with restesting the evidence in Applicant's case 31 months after Salvador's initial testing, agreed with Jacobs and Salvador as to the description of the packaging of the evidence. He also concluded that when he received the exhibit for retesting, it appeared that the proper procedures for preserving the chain of custody were followed by Salvador, indicating that the evidence was not false because the item Nacu checked out from evidence was the same evidence seized and checked into evidence by Jacobs.

As to the testing of the substance itself, the habeas court found, in relevant part, that Salvador claimed to have performed a Gas Chromotograph Mass Spectrometer

("GCMS") confirmatory test, which is a test widely accepted in the scientific community to identify unknown substances. Salvador concluded that the unknown substance was cocaine, and that it had a weight of 496.63 grams. Salvador's report that the substance contained cocaine passed a technical and administrative review. Brian Nacu's retesting included two confirmatory tests, both widely accepted in the scientific community. One test was the GCMS and the other was the Fourier Transform Infrared Test. Both tests resulted in a positive finding for cocaine. Nacu identified the weight of the substance as 485.88 grams—a difference of 10.75 grams from Salvador and, according to the findings of the trial court, an amount "attributable to the evaporation of chemical compounds during the thirty-one . . . month period between the initial analysis and reanalysis." Ultimately, Nacu concluded that Salvador's documentation was complete and similar to his own, and he "found nothing to suggest that [Salvador] misidentified any substance or failed to exert adequate effort to obtain a sample . . . ." Nacu's testing also satisfied technical and administrative review by reviewers other than the ones that approved Salvador's report. There were two other relevant findings of fact with respect to the testing of the evidence. First, "[n]one of the other drug exhibits checked out of the drug vault by [Salvador] on June 14, 2010, the date that he checked out [the evidence from Applicant's case], involved a bulk cocaine exhibit." Second, "[s]amples tested on the [GCMS] tray immediately before and after [the evidence in Applicant's case] were from a different laboratory case number and were positive for a controlled substance other than

cocaine." Also, the record reveals that the drug-analysis letter from DPS signed by Salvador, was dated June 16, 2010.

Applicant was charged with possession with intent to deliver a controlled substance weighing at least 400 grams. TEX. HEALTH & SAFETY CODE § 481.112(f). He pled guilty to the lesser-included offense of possession of a controlled substance per his plea-bargain agreement and was sentenced to 10 years' confinement on July 11, 2011. *Id.* § 481.115(f). He also waived his right to appeal as part of his plea bargain. Applicant, however, filed an application for a writ of habeas corpus on March 18, 2013, alleging that, due to Salvador's misconduct and the fact that the evidence was in the sole custody of Salvador for a period of time, he was entitled to relief.

The habeas court did not hold an evidentiary hearing because the judge correctly concluded that his recommendation to grant relief was "mandated due to the Court of Criminal Appeals' holding in [*Hobbs*] . . . ." However, the trial court made other conclusions of law, including that "[c]ompromises in a chain of custody generally necessitate the presentation of evidence involving tampering or fraud specific to the exhibit in question[,]" and that "[t]he Court concludes that there is no specific evidence that [Salvador] confused, comingled, or compromised the test results . . . , or that [Salvador's] analysis of Applicant's drug exhibit was unreliable." Despite those conclusions, the habeas court recommended that we grant relief based on this Court's opinion in *Hobbs*.

## II. Arguments

**A. The State**

The State argues that there should be a rebuttable presumption of invalidity "only when the misconduct is so persistent and pervasive that it shocks the conscience of the court[,]" and that Salvador's conduct did not rise to that level. Second, it asserts that, even if this Court holds that there is a per se presumption of a due-process violation, courts should review a number of factors and the totality of the circumstances of the case to determine if the defendant was harmed. Specifically, the State suggests that deciding whether a due-process violation should be presumed when a laboratory technician has committed misconduct in another case should be a two-step inquiry: "(1) whether misconduct is so egregious that the defendant is entitled to a presumption that misconduct is present in his case; and (2) whether the defendant can demonstrate prejudice."

The State explains that its proposed test is based on the jurisprudence of courts in West Virginia and Washington State that have also dealt with cases involving laboratory misconduct,[8] and the State argues that in West Virginia, a serologist "demonstrated a pattern and practice of misconduct consisting of overstating and falsifying laboratory results for more than a decade[,]" while in Washington State, a chemist regularly stole

---

[8] *See, e.g.*, *Matter of Investigation of West Virginia State Police Crime Laboratory Div.*, 438 S.E.2d 501, 503 (W. Va. 1993); *Matter of an Investigation of West Virginia State Police Crime Laboratory, Serology Division*, 445 S.E.2d 165, 168 (W. Va. 1994) ; *In re Renewed Investigation of State Police Crime Laboratory, Serology Division*, 633 S.E.2d 762, 765 (W. Va. 2006); *Burdette v. Zakaib*, 685 S.E.2d 903, 910 (W. Va. 2009); *In re Delmarter*, 101 P.3d 111 (Wash. Ct. App. 2004); *In re Brennan*, 72 P.3d 182 (Wash. Ct. App. 2003); *State v. Roche*, 59 P.3d 682 (Wash. Ct. App. 2002).

and used heroin that had been sent to his laboratory for testing. The State asserts that we should adopt the tests used in those jurisdictions. That is, "[b]oth jurisdictions concluded that the respective forensic scientist's misconduct was so persistent and pervasive that it shocked the conscience of the court. In other words, a rebuttable presumption of invalidity applied to the technician's work during the documented period of malfeasance[,]" but the courts also used a totality-of-the-circumstances test to assess whether a defendant was harmed by the technician's error. The State also notes that the Fifth Circuit, the Federal District of Massachusetts, the United States Court of Appeals for the Armed Forces, and the Supreme Court of Nebraska have adopted the same approach.[9]

The State further argues that "Texas appears to be the only jurisdiction to embrace a *per se* presumption of prejudice when a forensic scientist commits misconduct in another case[,]" and that this Court and the Supreme Court of the United States have cautioned that per se rules "should only apply when they will usually reach the correct

---

[9]*See, e.g.*, *State v. Edwards*, 821 N.W.2d 680, 696–00 (Neb. 2012) (defendant entitled to evidentiary hearing to prove that a forensic scientist who has falsified evidence in two other cases also did so in the defendant's case and that "false evidence could have affected the jury's verdict"); *United States v. Williams*, 985 F.2d 749, 752–57 (5th Cir. 1993) (denying postconviction relief based on a claim of a break in the chain of custody caused by a forensic laboratory technician who "had [allegedly] pilfered drugs from the lab's disposal file for personal use" in other cases when the record provides "no reason to believe" that the technician actually tampered with the applicant's drug exhibit, the defendant made furtive movements, and the technician's conclusion was confirmed after retesting); *Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996); *United States v. Wilkins*, No. 11-10217-RGS, 2013 WL 1899614, at *6–7 (D. Mass. May 8, 2013); *United States v. Luke*, 69 M.J. 309, 313–17 (C.A.A.F. 2011).

result as a matter of practice[,]" which is not the case here. *See Cantu v. State*, 930

S.W.2d 594, 600 (Tex. Crim. App. 1996) (citing *Coleman v. Thompson*, 501 U.S. 722,

737 (1991)). Moreover, the State argues that the presumption used by the Court in *Hobbs*

will not reach the correct result most of the time, and that such a presumption is

unrestrained by any temporal limitation; "years of valid analyses and convictions may be

unnecessarily tainted by a single act of malfeasance." Based on the extra-jurisdictional

cases cited, the State argues that, in lieu of a presumption of harm, this Court should

consider a series of nonexclusive factors to determine if a defendant suffered harm.[10]

The State also argues that its proposed test and burden of proof is in step with this

Court's habeas-corpus jurisprudence holding that the burden of proof to obtain relief lies

with the applicant. *See Ex parte Hogan*, 556 S.W.2d 352, 353 (Tex. Crim. App. 1977).

Finally, the State avers that the implications of this Court's temporally unrestrained

presumption of harm is profound because "[c]onvictions supported with significant

evidence, some perhaps decades old if the scientist is particularly experienced, would

---

[10]The factors described by the State include: (1) the results of retesting, (2) the temporal proximity between the misconduct and the analysis or testimony, (3) the nature, extent, and duration of the forensic scientist's misconduct, (4) the importance of the scientist's evidence to the case as a whole, (5) whether there was a confession, (6) whether the conviction was secured as the result of a guilty plea or a jury trial, (7) whether the forensic scientist testified at trial, (8) the existence of a field test, if any, (9) the existence of audio, video, or eyewitness evidence, (10) whether the defendant actually reviewed the forensic-science evidence, (11) whether the forensic-science evidence is fungible, (12) whether a chain of custody can be thoroughly documented, (13) the proximity of the forensic evidence to the defendant when seized, and (14) whether the forensic evidence was tested by a different scientist prior to the involvement of the forensic scientist who committed the misconduct.

stand to be unnecessarily reversed based on a single act of misconduct at any point in the scientist's career. Cynicism rather than confidence in the criminal justice system is bred by such an approach."

**B. Applicant**

Applicant responds that the State's suggested standard of presuming a due-process violation only when the technician's misconduct "shocks the conscience" is arbitrary and fails to provide "guidance in approaching either the Salvador cases or future situations involving systemic misconduct." Instead, Applicant suggests that this Court continue to apply *Hobbs* and *Turner*. Applicant cites a number of reasons for his position. First, using the State's proposed test "unfairly shifts the burden from the party whose agent created the problem," and "expensive havoc" would result in any trial courts in which defendants became aware of the misconduct. Also, Applicant asserts that the State could argue at a new trial that the "results in a particular case are reliable, and that a conviction is appropriate." Finally, Applicant explains that "[p]ost-conviction writ applications have been drafted and findings entered in reliance on this Court's previous decisions[,]" this Court's granting of relief in the "Salvador cases" sends an important zero-tolerance message, and "a court disregards its own precedent at the risk of eroding the public's confidence in its rulings." *See Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833 (1992).

Alternatively, Applicant argues that this Court should adopt a four-factor test to

determine if a laboratory technician's misconduct in another case should warrant a court to presume a due-process violation, and under that test, a defendant could be reprosecuted. Those proposed factors from Applicant include: (1) "[w]hether prior decisions of this Court suggest that a due process violation should be presumed in the situation under review"; (2) "[t]he number of cases affected and the relative seriousness of the errors or intentional misconduct that has been discovered"; (3) "[w]hether presuming a due process violation would deliver a strong message to both crime labs and to the public that forensic misconduct will not be tolerated by this Court"; and (4) "[w]hether presuming a due process violation would promote judicial economy under the circumstances." Applying these factors, Applicant argues, must result in the conclusion that Salvador's "negligent and intentional misconduct was significant enough that a due process violation should be presumed as to all of his cases."

## III. DISCUSSION

Based on the record in this case, Applicant's claim is most analogous to asserting that the State used false evidence to convict him. Applicant's claim is that Salvador had engaged in intentional laboratory misconduct without the knowledge of prosecutors, and Applicant was convicted because Salvador's testing results indicated that Applicant possessed almost one half of a kilogram of cocaine. Further, Applicant argues that because Salvador was later shown to have committed intentional misconduct in more than one case, this Court should continue to follow *Hobbs*. That is, Applicant asserts that we

should continue to presume that Salvador's sole possession of the drug exhibits made any test results gleaned from those exhibits presumptively false or unreliable, and the falsity in this case was material to Applicant's conviction—i.e., Applicant's due-process rights were violated, and he is entitled to relief because of the allegedly false evidence used against him.

Ordinarily, to prove a false-evidence claim, the applicant must first show that the evidence in his or her case was false, and second that the false evidence was material to the applicant's conviction or punishment. *See Ex parte Chavez*, 371 S.W.3d 207–10 (Tex. Crim. App. 2012). Under *Hobbs* and other opinions from this Court, we deviated from that approach by presuming both that any evidence in the possession of Salvador or generated by his alleged effort was false, and that the error was material to the applicant's conviction. In this case, Applicant asks us to continue to apply a test that would presume both falsity and materiality simply based on Salvador's misconduct in other cases. We decline to do so for the reasons we describe below. Instead, we implement a shifting burden as to the first issue of falsity, but with respect to the second issue—materiality—we hold that the applicant must prove that the false evidence was material to his or her conviction, even if an applicant can establish an inference of falsity or actual falsity.

After thoroughly reviewing the record, the filed briefs, and cases from other jurisdictions, we hold that an applicant can establish that a laboratory technician's sole

possession of a substance and testing results derived from that possession are unreliable, and we will infer that the evidence in question is false, if the applicant shows that: (1) the technician in question is a state actor, (2) the technician has committed multiple instances of intentional misconduct in another case or cases, (3) the technician is the same technician that worked on the applicant's case, (4) the misconduct is the type of misconduct that would have affected the evidence in the applicant's case, and (5) the technician handled and processed the evidence in the applicant's case within roughly the same period of time as the other misconduct. Once the applicant satisfies this initial burden by establishing the identified factors, the applicant has proven that the technician in question has engaged in a pattern of misconduct sufficiently egregious in other cases that the errors could have resulted in false evidence being used in the applicant's case. However, as part of this inquiry, it is incumbent upon the applicant to establish the extent of the pattern of misconduct the technician is accused of.[11] If Applicant can establish the necessary predicate facts, then the burden shifts to the State to offer evidence

---

[11]For example, did the intentional laboratory misconduct involve only a single type of misconduct—"dry labbing"—or was the technician also proven to have stolen, comingled, or otherwise contaminated drug exhibits? While, according to Applicant, Salvador's intentional misconduct is limited to "dry labbing," other technicians across the country have been accused of a wide variety of other outrageous behavior, including stealing drug exhibits and systemically falsifying evidence for the prosecution.

In this case, the scope of the inference of falsity established by Applicant with respect to Salvador's work does not appear to extend to a categorical inference of falsity in all respects. Instead Applicant alleges only that Salvador has engaged in a pattern of "dry labbing" (i.e., falsifying the results of testing). In such a case, it seems that the inference of falsity should be limited to the pattern of intentional misconduct proven. We leave these issues for the convicting court to resolve in the first instance on remand.

demonstrating that the laboratory technician committed no such intentional misconduct in the applicant's case. We realize that rebutting an applicant's successful claim that we should infer falsity will be an onerous burden, but we believe the burden is appropriate considering the egregious nature of the actions of Salvador. We also note that the initial burden on applicants to establish an inference of falsity is also onerous, and that, although the State may not be able to rebut an inference of falsity easily, in many cases the State will readily prevail on the materiality prong of the two-part test.

Although the State, Applicant, and the amicus make compelling arguments, we believe that the factors and process described above properly limit the likelihood that a defendant will be convicted based on false evidence without unfairly setting aside convictions obtained by the State. The suppression of evidence, because its use violates principles of due process, is strong medicine and should not be used lightly. Moreover, the remedy should be proportionate to the error. Although this test identifies a narrow exception to the ordinary rule that falsity of evidence must be proven in each individual case and cannot be established by identifying other cases in which a laboratory technician has demonstrated a pattern of intentional laboratory misconduct, this case demonstrates that such a limited exception is necessary. It would be an almost insurmountable burden for each applicant to demonstrate unreliability amounting to falsity in his or her specific case. However, it would be an equal miscarriage to disallow the State from presenting evidence that shows that the applicant's allegations of unreliability in other cases should

not apply in the applicant's case because the custody of evidence and testing in that applicant's case were performed properly or because there is other evidence showing that the evidence was actually not false.

### IV. Conclusion

In the past, this Court has dealt with claims in connection to Salvador's work as presumptive due-process violations in which we presumed that the evidence was false (although *Hobbs* stated the status of the evidence in terms of reliability), and that the false evidence was material to the applicant's conviction. However, we now recognize that it is not appropriate to presume error and materiality in every case on which Salvador worked. We believe the better method for resolving these claims is to allow an applicant to shift the burden of the falsity issue to the State if the requisite predicate is proven, but the burden of persuasion with respect to materiality will always remain with the applicant.[12] Thus, even if the State fails to rebut an inference of falsity, an applicant still must prove that the "false evidence" was material to his or her conviction. Having answered the question that we filed and set this case for, we remand this cause to the habeas court to apply the principles of this opinion in Applicant's case, including whether Applicant established an inference of falsity, and if so, to what extent it was material. The issues shall be resolved within 60 days after the mandate issues, and the supplemental record

---

[12]Issues of materiality that may need to be addressed include the nonexhaustive list of issues described in footnote seven of this opinion. *See supra* note 7. However, we also note that some types of evidence may be germane to both falsity and materiality.

shall be forwarded to this Court within 90 days. Any extensions of time shall be obtained from this Court.

Hervey, J.

Delivered: January 15, 2014

Publish