

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-80,099-01

### EX PARTE KEMOS MARQUE BARNABY, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 09-04-04192-CR IN THE 221ST DISTRICT COURT
### FROM MONTGOMERY COUNTY

**Per curiam.**

### O P I N I O N

Applicant Kemos Marque Barnaby plead guilty in a package deal to four separate offenses of possession of a controlled substance with intent to deliver and was sentenced to four concurrent fifty-year sentences. In his application for writ of habeas corpus, applicant challenged only the voluntariness of his plea to the offense charged in Cause No. 09-04-04192-CR. In that case, the forensic technician who was assigned to analyze the seized substance was Jonathan Salvador, who is known to have falsified test results. We remanded to the trial court so that the parties could present argument on what standard of review is appropriate for examining materiality.[1] We hold that

---

[1] "We order that this application be filed and set for submission to determine how materiality will be analyzed in the context of a guilty plea."

materiality of false evidence in the context of a guilty plea should be examined under the same standard used to assess materiality of counsel's deficient performance in the context of a guilty plea:[2] if applicant had known that the evidence was false (*i.e.*, "but for" the false evidence), he would not have plead guilty but would have insisted on going to trial. Although we infer that the laboratory report in applicant's case was falsified, we find that its falsity was not material to his decision to plead guilty, and we deny relief.

**Facts**

On March 13, 2009, Conroe Police Department Officer J. Berry stopped a car for a traffic offense. Fellow Conroe police officer J. Blackwelder was nearby and came to assist. As Officer Blackwelder was approaching the driver's side, applicant exited the car and met with the officer outside. Officer Berry approached the passenger's side of the car and spoke with the passenger through the passenger-side window. Officer Berry smelled a strong odor of marijuana coming from inside the car and asked the passenger to step outside. The passenger told Officer Berry that the car did not belong to the passenger and that he did not know if the car's owner smoked marijuana. Officer Berry searched the passenger but found no contraband.

Meanwhile, Officer Blackwelder directed applicant to the front of Officer Blackwelder's

---

[2] *Strickland v. Washington*, 466 U.S. 668, 687 (1984), requires that in order for a defendant to show that counsel's assistance was so defective as to warrant reversal of a conviction, a defendant must show: (1) counsel made errors so serious that counsel was not functioning as "counsel" as guaranteed by the Sixth Amendment; and (2) that counsel's deficient performance prejudiced the defense. *Strickland's* two-prong test for ineffective assistance of counsel was made applicable to guilty pleas in *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). But *Hill* modified the "prejudice" prong by requiring defendants to show that the ineffective performance affected the outcome of the plea process. *Id.* at 59. When an applicant challenges the voluntariness of a plea based on the ineffectiveness of his attorney, he must show that, "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Ex parte Moody*, 991 S.W.2d 856, 858 (Tex. Crim. App. 1999) (citation omitted). A "but for" analysis is the same as a "had he known" analysis. *See Ex parte Smith*, 678 S.W.2d 78, 79 (Tex. Crim. App. 1984) (finding that the applicant was not properly admonished and holding that the applicant's guilty plea was not knowingly and voluntarily entered into when he would not have pled guilty had he known that the maximum penalty for his offense was one-half of what he was told).

patrol car, where he questioned applicant and then conducted a consensual pat-down search. During the search, Officer Blackwelder found a small plastic bag in the watch pocket of applicant's pants. He handed the bag to Officer Berry, who examined the bag and recognized its contents–several off-white chunks or rocks–as crack cocaine. Officer Berry showed the bag to Officer Blackwelder, who arrested applicant. Applicant denied that he had possessed the small plastic bag. Because it was raining, Officer Berry placed the plastic bag in a separate paper bag to protect it from the elements, locked the paper bag in the front seat of his patrol car, and placed applicant in the back seat.

On the way to the Conroe Police Department, applicant complained to Officer Berry that the substance in the small plastic bag had not been tested. At the police department, Officer Berry was able to find parking in a covered area out of the rain, where he dried off the hood of his patrol car, weighed the substance,[3] and performed a field test on the substance. A test wipe produced a positive result for cocaine. Applicant told Officer Berry that he knew the substance would come back positive, but he again denied that he had ever possessed it.

On April 24, 2009, the substance was delivered to the Texas Department of Public Safety (DPS) crime laboratory in Houston for testing. On May 21, 2009, a forensic scientist at the laboratory, Jonathan Salvador, issued a drug-analysis report that concluded that the substance contained cocaine. Salvador certified the analysis on July 9, 2009.

### Salvador

On January 26, 2012, DPS laboratory technician Andrew Gardiner was having trouble with his testing instrument and decided to compare results with Salvador's instrument by running in his own instrument a sample that had already been tested in Salvador's instrument. When he went to the

---

[3] Officer Berry reported the weight as four grams.

sample's noted location, a vial from a different case was there instead. The correct vial was nowhere to be found on the sample tray. Looking at the files for the two samples, Gardiner suspected Salvador may have "dry-labbed" the samples.[4] Salvador apparently had had trouble obtaining results from the first sample and then substituted the results from the second sample, passing it off as a test of the first. Gardiner consulted another technician, who agreed with his opinion, but they decided to give Salvador the benefit of the doubt and wait to examine Salvador's final reports for the two samples. After the reports were submitted for administrative review, Gardiner saw that the results were identical.

Gardiner notified the crime-laboratory supervisor, Severo Lopez, who discussed the issue with Keith Gibson, the crime-laboratory manager. Gibson instructed Lopez to retest the samples and check their results against those submitted by Salvador. Lopez searched for the missing first sample's location in the laboratory's database, and the system indicated that it was still in Salvador's custody. Lopez approached Salvador and asked him for the evidence, which was in Salvador's bench locker. Salvador asked Lopez why the samples were being retested, and Lopez responded that it was merely for quality-assurance purposes. The retesting results differed from those that Salvador had entered into the file. The first sample contained many more impurities than had been reported, and it appeared that Gardiner's suspicion was correct and that Salvador had used the second sample to generate results for both reports. Salvador was suspended, and his previous cases were retested.

The Texas Rangers conducted an investigation for possible criminal charges of tampering with governmental records. Rangers interviewed the DPS laboratory technicians, including

---

[4] Dry-labbing occurs when results of a test are fabricated. *See, e.g., Ex parte Coty*, 418 S.W.3d 597, 598 n.1 (Tex. Crim. App. 2014).

Salvador, and brought the evidence to the Harris County District Attorney's Office, but a grand jury declined to indict. The DPS Office of Inspector General issued a report concluding that Salvador failed to properly follow laboratory protocols and procedures, misidentified substances, and dry-labbed samples. In June of 2012, after receiving the Inspector General's report, a decision was made to terminate Salvador's employment.

The consequences of Salvador's dry-labbing did not end with his resignation. The investigation called into question the veracity and reliability of many cases handled by Salvador. We granted relief on several applications for writ of habeas corpus, finding that each case involved a presumptive violation of due process. *E.g.*, *Ex parte Turner*, 394 S.W.3d 513 (Tex. Crim. App. 2013) (per curiam); *Ex parte Hobbs*, 393 S.W.3d 780 (Tex. Crim. App. 2013) (per curiam).

Then, in *Ex parte Coty*, 418 S.W.3d 597 (Tex. Crim. App. 2014) (*Coty I*), we retreated from a presumption that due process was violated in every Salvador case. *Coty*, 418 S.W.3d at 605. Finding that the Salvador cases were analogous to false-evidence cases, we required a showing of falsity and materiality. *Id.* Instead of a presumption of falsity, we implemented a five-part protocol to be used when an applicant or appellant raises an inference of falsity. *Id.* If an applicant can satisfy his initial burden, the burden shifts to the state to offer evidence demonstrating that the laboratory technician in question committed no such misconduct in that applicant's or appellant's case. *Id.*[5]

### Applicant's Case

In July 2012, after this case had been resolved, the Montgomery County District Attorney's

---

[5] After remand in *Coty I*, the habeas court found that Coty failed to establish both falsity and materiality. We agreed and denied relief. *Ex parte Coty*, 432 S.W.3d 341 (Tex. Crim. App. 2014) (*Coty II*).

Office informed applicant about the Salvador investigation. In May 2013, applicant filed an application for writ of habeas corpus that sought a new trial based on this newly discovered evidence. The habeas court entered findings of fact and conclusions of law and recommended that we deny relief.

Following our decision in *Coty I*, we remanded applicant's case to the habeas court to consider his claims in light of that case. *Ex parte Barnaby*, No. WR-80,099-01, 2014 WL 631073 (Tex. Crim. App. Feb. 12, 2014) (per curiam) (not designated for publication). Initially, the habeas court found that, although applicant was able to raise an inference of falsity, the state was able to overcome that inference, and the court recommended that we deny relief. However, applicant asked the habeas court to take judicial notice that Officer Blackwelder, the officer who performed the pat-down search of applicant, had also come under scrutiny.[6]

With Officer Blackwelder's credibility in doubt, the habeas court reconsidered its recommendation in applicant's case and entered supplemental findings of fact and conclusions of law that determined that applicant met the standard of *Coty I* and recommended that we grant relief.[7] Upon submission to this Court, we noted that the state conceded the issue of falsity, and we ordered the parties to discuss the issue of materiality in the context of a plea of guilty. *Ex parte Barnaby*, No. WR-80,099-01, 2014 WL 2803016 (Tex. Crim. App. June 18, 2014) (per curiam) (not

---

[6] While off-duty on July 31, 2013, Officer Blackwelder shot and killed a teenage shoplifting suspect in what he described at the time as a justified shooting in self defense. After investigation, it turned out that Officer Blackwelder had misstated the truth of what had occurred, and he was indicted for manslaughter, tampering with a governmental record, and making a false report to a peace officer.

[7] Three weeks after the habeas court entered its supplemental findings and conclusions, a Montgomery County jury found Blackwelder guilty of manslaughter. Blackwelder was sentenced to five years' community supervision. The court of appeals dismissed Blackwelder's appeal for want of prosecution for failing to file the clerk's record. *Blackwelder v. State*, No. 09-14-00354-CR, 2014 WL 6985089 (Tex. App.–Beaumont Dec. 10, 2014, no pet.) (mem. op., not designated for publication).

designated for publication).

The dashboard videos from the patrol cars of both Officers Berry and Blackwelder were found, and we ordered the habeas court to examine them to determine whether they would affect that court's recommendation. *Ex parte Barnaby*, No. WR-80,099-01, 2014 WL 5422014 (Tex. Crim. App. Oct. 15, 2014) (per curiam) (not designated for publication). Based upon the videos, the habeas court entered supplemental findings of fact that determined that, when Officer Blackwelder pulled the small plastic bag from applicant's pocket, applicant immediately stated the bag was not his and had not been on his person. The court also found that applicant had consistently denied that the bag was in his pocket, that he owned the bag, and that the bag had ever been on his person. Finally, the court found that, during Officer Berry's test of the substance, applicant continued to deny that he had possessed the bag and that his statement that he knew the substance would test positive was made amid assertions that he never possessed the bag.

### Standard of Review

On post-conviction review of habeas corpus applications, the convicting court is the "original factfinder," and this Court is the ultimate factfinder. *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). We generally defer to and accept the convicting court's findings of fact and conclusions of law when they are supported by the record. *Id.* However, "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions." *Id.*

### Involuntary Plea

Applicant argues that, because of Salvador's false report, his guilty plea was involuntary. A guilty plea is a waiver of several federal constitutional rights, including the protections against

self-incrimination, the right to a speedy and public trial by jury, and the right to confrontation. *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969). However, that waiver must be not only voluntary but also a knowing, intelligent act done with sufficient awareness of the relevant circumstances and likely consequences. *Brady v. United States*, 397 U.S. 742, 748 (1970); *Dansby v. State*, 448 S.W.3d 441, 451 (Tex. Crim. App. 2014). The standard of voluntariness is that

> [a] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady*, 397 U.S. at 755 (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957)).

Misrepresentations that may cause a plea to be involuntary can come from a variety of sources. While many claims allege erroneous advice or misinformation by defense counsel,[8] misrepresentations can also come from the trial court,[9] or the state.[10] Misrepresentation can be even more fundamental: a plea would be involuntary if a defendant is "in total ignorance of the precise nature of the charge and the range of punishment it carries . . .. Such a defendant 'has such an

---

[8] *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356 (2010) (defense counsel's failure to advise defendant about immigration consequences of guilty plea); *Ex parte Moussazadeh*, 361 S.W.3d 684 (Tex. Crim. App. 2012) (defense counsel's misinformation regarding parole eligibility, on which defendant relied in pleading guilty); *Ex parte Griffin*, 679 S.W.2d 15, 18 (Tex. Crim. App. 1984) (defense counsel told defendant that plea agreement included disposition of an earlier criminal case, when in fact it did not).

[9] *See, e.g.*, *Ex parte Williams*, 704 S.W.2d 773 (Tex. Crim. App. 1986) (guilty plea involuntary where trial court volunteered incorrect admonishment that defendant would receive probation, when probation was not within range of punishment available).

[10] *See, e.g.*, *Ex parte Reyna*, 707 S.W.2d 110, 111 (Tex. Crim. App. 1986) (plea agreement called for Texas sentence to run concurrently with Mississippi sentence; since not possible, plea set aside); *McGuire v. State*, 617 S.W.2d 259, 261 (Tex. Crim. App. 1981) (prosecutor improperly assured *pro se* defendant that guilty plea could be withdrawn if court rejected punishment recommendation, when governing statute did not apply to misdemeanor cases); *Ex parte Lewis*, 587 S.W.2d 697, 701 (Tex. Crim. App. 1979) (failure to disclose psychiatric report that suggested defendant may have been insane at the time of the act and incompetent to stand trial).

incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt. Without adequate notice of the nature of the charge against him, or proof that he in fact understood the charge, the plea cannot be voluntary . . . in this sense.'" *Davison v. State*, 405 S.W.3d 682, 686 (Tex. Crim. App. 2013) (quoting *Henderson v. Morgan*, 426 U.S. 637 (1976)).

False evidence can also cause a defendant to be misinformed. The key factor is whether a defendant has "sufficient awareness of the relevant circumstances and likely consequences" such that his plea is a knowing, intelligent act. *Brady*, 397 U.S. at 748. If a defendant's knowledge of the relevant circumstances is lacking because of false evidence (instead of, for example, erroneous advice by counsel), his awareness is not "sufficient" for his plea to be voluntary. But a plea is not involuntary simply because a defendant does not correctly assess every relevant factor entering into his or her decision. *Ex parte Evans*, 690 S.W.2d 274, 277 (Tex. Crim. App. 1985); *Brady*, 397 U.S. at 757. The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749. In considering the voluntariness of a guilty plea, the record should be examined as a whole. *Martinez v. State*, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998). "The crucial issue is whether, under all the facts and circumstances, the plea was truly voluntary." *Gaither v. State*, 479 S.W.2d 50, 51 (Tex. Crim. App. 1972) (quoting *Schnautz v. Beto*, 416 F.2d 214, 216 (5th Cir. 1969)).

**False Evidence**

In *Coty I*, we recognized that claims based upon a laboratory technician's malfeasance were analogous to claims that the state used false evidence to convict a defendant. *Coty*, 418 S.W.3d at 604. To prove a false-evidence habeas corpus claim, a claimant must first show that the evidence in his or her case was false and then that the false evidence was material. *See Ex parte Weinstein*, 421

S.W.3d 656, 665 (Tex. Crim. App. 2014).

Although the falsity of evidence ordinarily must be proven in each individual case, we noted in *Coty I* that an exception was needed when a laboratory technician has demonstrated a pattern of misconduct. *Coty*, 418 S.W.3d at 606. "It would be an almost insurmountable burden for each applicant to demonstrate unreliability amounting to falsity in his or her specific case." *Id.* Instead, in technician-misconduct cases,

> an applicant can establish that a laboratory technician's sole possession of a substance and testing results derived from that possession are unreliable, and we will infer that the evidence in question is false, if the applicant shows that: (1) the technician in question is a state actor, (2) the technician has committed multiple instances of intentional misconduct in another case or cases, (3) the technician is the same technician that worked on the applicant's case, (4) the misconduct is the type of misconduct that would have affected the evidence in the applicant's case, and (5) the technician handled and processed the evidence in the applicant's case within roughly the same period of time as the other misconduct. Once the applicant satisfies this initial burden by establishing the identified factors, the applicant has proven that the technician in question has engaged in a pattern of misconduct sufficiently egregious in other cases that the errors could have resulted in false evidence being used in the applicant's case. However, as part of this inquiry, it is incumbent upon the applicant to establish the extent of the pattern of misconduct the technician is accused of. If [the applicant] can establish the necessary predicate facts, then the burden shifts to the State to offer evidence demonstrating that the laboratory technician committed no such intentional misconduct in the applicant's case.

*Coty*, 418 S.W.3d at 605. After an applicant makes the initial showing of falsity, he must still prove that the false evidence (whether proved or inferred) was material to the decision to plead guilty . *Id.* at 606. The burden of persuasion with respect to materiality remains with the applicant. *Id.*

By and large, our false-evidence cases involve the use of false testimony at trial. Because applicant's application is based on a claim that false testimony induced his guilty plea, we asked the parties to brief how the materiality of false evidence should be analyzed in the context of a guilty

plea.[11] Applicant and the state agree that materiality should be examined in a manner similar to that used to the analysis of the materiality of ineffective assistance of counsel to a decision to plead guilty. In such cases, "[w]hen a defendant enters his plea upon the advice of counsel and subsequently challenges the voluntariness of that plea based on ineffective assistance of counsel, the voluntariness of such plea depends on (1) whether counsel's advice was within the range of competence demanded of attorneys in criminal cases and if not, (2) whether there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Ex parte Morrow*, 952 S.W.2d 530, 536 (Tex. Crim. App. 1997) (citing *Hill v. Lockhart*, 474 U.S. 52 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984); *McMann v. Richardson*, 397 U.S. 759 (1970)).[12]

In cases involving the alleged misconduct of a laboratory technician, we recognized that the burden of proving falsity in a particular case would be "almost insurmountable," so we provided a means to raise an inference of falsity. *Coty*, 418 S.W.3d at 605-06.

## Falsity

Following the *Coty I* protocol, the habeas court found that applicant was able to establish the inference of falsity and that the state had failed to overcome that inference. Based upon our own review of the record, we agree with the habeas court's findings and conclusion as to falsity.

In order to raise an inference of falsity, an applicant must show that:

(1) the technician in question is a state actor, (2) the technician has committed

---

[11] *Coty* was also a plea-bargain case. However, we did not discuss materiality in the context of a guilty plea in either *Coty I*, when we laid out the standard for establishing an inference of falsity, or in *Coty II*, when we agreed with the habeas court's finding that Coty failed to establish both an inference of falsity and the falsity's materiality.

[12] "Reasonable probability" is also the standard of materiality. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

multiple instances of intentional misconduct in another case or cases, (3) the technician is the same technician that worked on the applicant's case, (4) the misconduct is the type of misconduct that would have affected the evidence in the applicant's case, and (5) the technician handled and processed the evidence in the applicant's case within roughly the same period of time as the other misconduct.

*Coty*, 418 S.W.3d at 605. As a laboratory technician at the Department of Public Safety's Houston laboratory, Salvador was clearly a state actor. Based upon the report from the Office of the Inspector General, Salvador engaged in multiple instances of misconduct. Salvador was the technician who worked on applicant's case: he signed the analysis report for the substance in the small plastic bag and signed a certificate of analysis certifying that he had tested the substance. Salvador's misconduct is the type of misconduct that would have affected the evidence in applicant's case; the instances of misconduct recounted in the Inspector General's report include the dry-labbing incident as well as a failure to observe the difference between powder cocaine and cocaine base (crack), the substance allegedly involved in applicant's case. Salvador handled and processed the evidence in applicant's case within the same period of time as the other misconduct. The sample in applicant's case arrived at the DPS laboratory on April 24, 2009, and Salvador issued his report on May 21, 2009. According to the *Brady* notice provided by the Harris County District Attorney's Office in *Coty* and the laboratory reports related to that case, Salvador's misconduct occurred as early as April 2009. Therefore, it is reasonable to presume that Salvador's misconduct began at least by April 2009 and continued until he was caught and suspended in 2012. We accordingly find that the five factors laid out in *Coty I* are met, and the burden shifts to the state to offer evidence demonstrating that Salvador committed no such intentional misconduct in applicant's case. *Coty*, 418 S.W.3d at 605.

The state conceded that applicant was able to raise the inference of falsity and offers no evidence that Salvador did not commit misconduct in this case. The sample was destroyed and is

no longer available to verify the accuracy of the report, we will therefore infer that Salvador's report is false.[13]

## Materiality

In the context of a guilty plea, materiality affects the voluntariness of the plea, and the voluntariness of the plea affects whether the information that was considered by the defendant in making a decision to plead guilty was material. The materiality of counsel's deficient performance is measured by what impact counsel's errors had on the defendant's decision to plead guilty. Correspondingly, the materiality of false evidence is measured by what impact that false evidence had on the defendant's decision to plead guilty.

In the context of a trial, an applicant who proves a due-process violation stemming from the state's use of material false testimony necessarily proves harm because "a false statement is material only if there is a reasonable likelihood that the false testimony *affected the judgment of the jury*."[14] However, that standard of materiality cannot work in the context of a guilty plea because there is no jury. We therefore approach an applicant's claim that his guilty plea was involuntary because he was unaware of false evidence differently than we would approach a claim that his conviction was obtained with false evidence. In determining the voluntariness of a plea of guilty, the more logical question is whether there is a reasonable likelihood that it affected the defendant's decision to plead guilty, not whether it affected the conviction or sentence. Would the defendant, knowing of the falsity of the evidence, still have plead guilty or would he have insisted on going to trial? If he

---

[13] Our conclusion that applicant successfully raised the inference of falsity and the state failed to rebut that inference should not be taken as an affirmative finding that the substance was not cocaine.

[14] *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014) (emphasis in original). Under *Weinstein*, the state's use of *material* false evidence violates a defendant's due-process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

would have chosen trial, the false evidence was material.

In this case, trial-court cause number 09-04-04192-CR, applicant was indicted for possession with intent to deliver cocaine, in the amount of one gram or more but less than four grams. Because the indictment alleged that applicant had at least two prior, sequential, felony convictions, he was treated as an habitual offender, and the punishment range of this offense was therefore modified to 25 to 99 years or life. At the same time, applicant was charged with three additional charges of possession with intent to deliver cocaine in a drug-free zone, and all three charges were also enhanced pursuant to the habitual-offender statute.[15] On August 23, 2010, applicant entered into a plea bargain that resolved all four drug charges and pursuant to which applicant plead guilty to all four pending charges of possession with intent to deliver and "true" to the prior felony enhancements in exchange for an agreement for four concurrent fifty-year sentences. The state waived the drug-free-zone affirmative finding as to the three judgments that are not challenged here.

Among the relevant facts and circumstances surrounding applicant's decision to accept the state's plea-bargain offer, is the question of whether the value of the undisclosed information, in this case the falsity of the laboratory report, was outweighed by the benefit of accepting the plea offer.[16] Applicant was facing three additional drug cases, and even if the falsity of the laboratory report had come to light and the state had decided to dismiss this case, the state still could have prosecuted applicant for the other three cases. If applicant had been found guilty in those three cases, the trial

---

[15] Texas Penal Code Section 12.42(d). None of the drugs seized in these three cases had been tested by Salvador, and none of those convictions are challenged here.

[16] *See Ferrara v. United States*, 456 F.3d 278, 294 (1st Cir. 2006).

15

court would have had the discretion to impose consecutive sentences.[17]  Furthermore, as part of the terms of the plea bargain, the state waived the drug-free-zone finding on the other three cases, which markedly affected applicant's parole eligibility.[18]  Thus, applicant's assertion that he would not have plead guilty had he known of the falsity of the laboratory report is unpersuasive in light of the benefit he received from the plea bargain.[19]

### Conclusion

We hold that, in a case involving a laboratory technician's malfeasance, and in the context of a plea of guilty, the materiality of false evidence is measured by what impact that false evidence had on the defendant's decision to plead guilty.  In this case, we conclude that, by a preponderance of the evidence, the value of the plea bargain to applicant outweighed the value of knowing, before entering into his plea, that the laboratory report in this single case was false.  Relief is denied.

Delivered:  November 4, 2015
Publish

---

[17] Tex. Code Crim. Proc. art. 42.08(a).  Applicant claims that his "sentence of 50 years is only ten years down from the maximum possible term used to calculate parole eligibility." Brief for Applicant at 8, *Ex parte Kemos Marque Barnaby*, 2014 WL 2803016 (Tex. Crim. App. 2014) (No. WR-80,099-01), 2014 WL 6473373, at *7 n.3.  As noted above, this is not necessarily correct in light of the fact that, had applicant been convicted at trial, the trial court had the discretion to stack the sentences in the other three cases, even if this case had been dismissed.

[18] *See* Tex. Health & Safety Code § 481.134(e).  As an habitual offender in a drug-free zone case, applicant's minimum sentence would have begun at 30 years, not 25 years. *See also, Moore v. State*, 371 S.W.3d 221, 232 n.1 & n.2 (Tex. Crim. App. 2012).  Because the plea-bargain agreement was for a sentence of 50 years, the affirmative finding would not have affected the length of appellant's sentence.  But the finding would have affected his parole eligibility. *See* Tex. Gov't Code § 508.145(d)(1) (must serve lesser of ½ of sentence or 30 years if convicted under possession with intent to deliver in a drug-free zone (Tex. Health & Safety Code § 481.134) if drug is in penalty-group (Tex. Health & Safety Code § 481.102; cocaine)).

[19] Applicant had a clear incentive to plead guilty in this case, despite his professed belief in his innocence. *North Carolina v. Alford*, 400 U.S. 25, 38 (1970).